[No. 14967. Department Two. March 12, 1919.]

JESSIE P. GREENWOOD, *Appellant*, v. KATE H. BEAN *et al., Respondents.*[1]

VENDOR AND PURCHASER (22, 60, 73, 159)—RESCISSION—VALIDITY OF CONTRACT—FRAUD OF VENDOR. In the absence of proof with sufficient certainty of any misrepresentations, a vendee cannot rescind a sale of a lot, mistakenly assumed to be a corner lot because of a supposed shortage in area of the platted addition, where he acted on his own information and inspected the lot upon the ground.

Appeal from a judgment of the superior court for Spokane county, Oswald, J., entered March 30, 1918, upon findings in favor of the defendants, in an action to foreclose a mortgage, after a trial on the merits to the court. Reversed.

*O. C. Moore,* for appellant.

*Hamblen & Gilbert,* for respondents.

PARKER, J.—The plaintiff, Mrs. Jessie P. Greenwood, commenced this action in the superior court for Spokane county, seeking the foreclosure of a mortgage executed by the defendants, Kate H. Bean and husband, to secure the payment of a note executed by them in part payment of the purchase price of a lot which was purchased by them from H. E. Prickett, and upon which the mortgage was given, Mrs. Greenwood being now the owner of the note and mortgage.

The defense was rested upon the ground that Prickett, through his agent, falsely represented to Bean, who was acting for himself and wife in purchasing the lot, that it was a corner lot; that, relying upon such false representations, they were induced to purchase the lot; that they were thereby damaged more than the balance due upon the purchase price, which

[1]Reported in 179 Pac. 91.

is now represented by the note sued upon; and that Mrs. Greenwood is not an innocent holder of the note for value, but that it is subject to the same defenses as if it were in the hands of Prickett. Mrs. Bean and her husband offered to reconvey the lot upon repayment to them of the amount they had paid on the purchase price, or to waive damages upon the cancellation of the note and satisfaction of the mortgage, and prayed for relief in their answer accordingly.

Trial upon the merits resulted in findings and decree in favor of Mrs. Bean and her husband, cancelling the note and decreeing the mortgage fully satisfied, the trial court manifestly proceeding upon the theory that Mrs. Bean and husband had suffered damages by false representations as to the lot being a corner lot, inducing them to purchase it, in an amount at least equal to the amount of the note sued upon, and that they were entitled to have such damages offset against Mrs. Greenwood, the present owner of the note. From this disposition of the case, Mrs. Greenwood has appealed to this court.

The property here in question is lot 11, in block 12, of Nosler's addition to Spokane. According to the official plat of the addition, of record in the county auditor's office, the east boundary of blocks 12, 13, and 25 of the addition is also the east boundary of the addition, there being no street along the east boundary within the addition. The lots in those blocks front north and south, each block containing twelve lots, numbered 1 to 6 from east to west in the north half, and 7 to 12 from west to east in the south half of each block; so that lots numbered 12 are the southeast corner lots of each of those blocks, while lots numbered 11 are the ones next west, and are therefore not corner lots. At the time of the sale of lot 11, in

block 12, by Prickett to Mrs. Bean and husband in 1910, Pacific avenue, upon which the lot fronts, was improved by grading and the construction of curbs in such manner as to indicate upon the ground that there was a street lying along the east boundary of lots 2 and 11 in each of blocks 12, 13, and 25, which, if such were the fact, would eliminate lots 1 and 12 in each of those blocks, and make lots 2 and 11 in each of them corner lots. There was, however, no street improvement outside of the side-lines of Pacific avenue. Unofficial maps of that portion of the city, commonly used by real estate men, also indicated the existence of a street along the east boundary line of lots 2 and 11 in each of those blocks, and did not show any lots numbered 1 or 12 in either of those blocks, though such unofficial map showed every other block in Nosler's addition to contain a lot numbered 1, and every other full block to contain a lot numbered 12, the addition containing twenty-five blocks, of which thirteen were full blocks. There does appear, upon the unofficial maps commonly used, a street called Garfield street along the east line of blocks 12, 13, and 25 of Nosler's addition; but apparently it was platted as a street in the adjoining addition. This record seems to suggest that the notion that there were in fact no lots numbered 1 and 12 in blocks 12, 13 and 25, of Nosler's addition, comes from a belief on the part of some one, as evidenced by the unofficial maps in common use, that those blocks were in fact short upon the ground one tier of lots on the east side of the addition, thus eliminating lots 1 and 12 in each block on that side. It was, however, determined in 1913, by litigation then concluded, that this was not so, but that lots 1 and 12 of those blocks did exist upon the ground, thus confirming the correctness of the survey of the plat of Nosler's addition, as officially recorded.

On March 9, 1910, H. E. Prickett, being then the owner of lot 11 in block 12, sold and conveyed it to respondents Mrs. Bean and husband, the agreed sale price being $3,500, of which $1,750 was paid in cash, the balance being evidenced by two promissory notes for $875 each, executed and delivered by them to him, which notes were also secured by the execution and delivery of a mortgage upon the lot. One note, falling due one year after date, was paid. The other note, falling due two years after date, was not paid. This is the note upon which recovery is here sought. It has become the property of plaintiff and appellant, Mrs. Greenwood. For present purposes, we shall assume that she is not an innocent holder thereof for value, and that it is subject to all the defenses it would be subject to in the hands of Prickett, as if he were here attempting to recover thereon the balance due upon the purchase price of the sale of the lot by him to Mrs. Bean and husband.

Negotiations looking to the sale of the lot were commenced in February, 1910, between F. J. Root, representing Prickett, and Victor E. Piolett, representing Mrs. Bean and her husband. Root was then engaged in the real estate business and Piolett was also engaged in the real estate business as the partner of Mr. Bean, the latter being one of the oldest and most experienced real estate men in Spokane. Piolett's testimony was, in part, as follows:

"Mr. Root came into the office. He used to come in quite often. And talked to me about this piece of property out on Pacific avenue. He said he had a corner lot out there, he thought it was a pretty good buy, and I told him that Mr. Bean had told me to look around for something while he was gone, and if anything out in that district that looked pretty good, to make some sort of payment to tie it up and when

he got back he would close the deal. We went out there together, and we looked at the lot and it looked like a corner lot all right, and we looked at the maps in the office, and the map described it as a lot and block number, no chance to go wrong, it gave the streets and everything, and we just went out and looked at it. The map showed it was on the corner of Garfield and Pacific avenue, and we went out to look at it. The curbing had been done there, and it of course turned right in there at Garfield just like they are all along those streets that are graded along there. Pacific avenue is graded and curbed. That curbing turns in on both sides of Garfield and on the east side of this lot. I looked at the map in my office at that time with Mr. Root . . . I made a payment to Mr. Root for Mr. Bean, and Mr. Root gave me a receipt. I have not that receipt. I do not know what has become of it . . . I was already quite familiar with the locality in that section of the city . . . We had been handling other properties in that locality; we had listings of different properties in there . . . After Mr. Bean returned, I just simply told him about the transaction and of course he called Mr. Root in and we went out and looked at it again. Mr. Bean went along. I do not know how long that was before the deed was executed. I never had anything more to do with it after that . . . According to my recollection, I never talked to Mr. Prickett in regard to it . . . I think it was $150 that I paid him (Root) . . . In making the transaction I relied exclusively on what is shown here by this map. Of course, it is a very easy matter to locate property. I relied upon the map, on the indications and also it was being sold to us as a corner lot. Mr. Root was selling it to me as a corner lot. He said it was a corner lot. He brought it to me that way, as a corner lot.''

Everything that Mr. Bean did, it is now conceded, was in fact done for himself, though the title to the lot was taken in the name of Mrs. Bean, who, he says, did not and does not now have any real interest in

the lot, she signing the notes and mortgage because the title was taken in her name in the deed from Prickett. Mr. Bean testified in part as follows:

"As soon as I came home, Mr. Root came over to the office when he heard I was there, and we went out and looked at the property . . . We had that map ever since 1907. I looked over this map with Mr. Root at that time in the office and on the wall map, too. Both of these maps show a street there. There is not a real estate map in Spokane that does not show this Garfield street to be a street. You cannot buy one. After I had this conversation with Mr. Root in regard to this lot, Mr. Piolett and Mr. Root and I went out and looked at the lot . . . After Mr. Root and Mr. Piolett and I went out there and looked the lot over, I told Mr. Root that I would complete the purchase."

Root was not produced in court as a witness, but his deposition, being taken in behalf of Mrs. Bean and her husband, was read by their counsel upon the trial. Root testified therein as follows:

"Q. State whether or not you had anything to do with the selling of lot 11, in block 12 of Nosler's addition to Spokane Falls (now Spokane) Washington, to Walker L. Bean or to Mr. Victor E. Piolett, representing Mr. Bean? A. I did.

"Q. State fully whether you made any representations to said Walker L. Bean or to said Victor E. Piolett acting for said Walker L. Bean, or to both of them, in regard to whether or not the said lot was a corner lot? A. Yes, it was a corner lot, to my understanding.

"Q. State fully who authorized you, if anyone, to make such representations? A. The owner, Harris E. Prickett.

"Q. State whether or not you went upon the ground and pointed out the lot heretofore referred to, with either Mr. Piolett or Mr. Walker L. Bean, or both of them, and if so, whether at such time any representation was made by you while on the ground

that the lot in question was a corner lot? A. I gave them to understand it was a corner lot.

"Q. State whether your authority in that connection (sale of the lot) was oral or in writing? A. I don't remember.

"Q. State what commission or compensation by the terms of said agreement, you were to receive on the sale of said lot? A. I don't remember.

"Q. Is it not true that Mr. Piolett and Mr. Bean, one or both of them, in discussing said lot turned to and examined maps and plats of said Nosler's addition in their own office? A. I don't remember.

"Q. Is it not true that Mr. Piolett and Mr. Bean, one or both of them, stated to you in substance that they were of their own independent knowledge, gained from their experience in the real estate business and from maps, plats, etc. in their own office or elsewhere, entirely familiar with the street conditions surrounding or in the vicinity of said lot? A. I don't know."

Root at no time during the negotiations produced any map. All references to maps were to those in the office of Bean and Piolett and produced by one or the other of them. An abstract of title to the lot was furnished, and the title being found satisfactory, the sale was closed by the execution of the deed, notes, and mortgage. There was in the abstract so furnished a map, indicating that lot 11 was a corner lot, as indicated upon the unofficial maps. But the abstract shows four instruments affecting the title to lot 11, wherein there is described lots 11 and 12 in block 12, all of which instruments also describe lots 1 and 12 in block 13, suggesting a row of lots along the east boundary and in Nosler's addition, which would make lot 11 an inside and not a corner lot. This abstract was in Mr. Bean's hands several days before he closed the deal, during which time he admits he looked over the abstract himself, though he finally

depended upon the opinion of his attorney as to the title. Prickett never talked to Mr. or Mrs. Bean at any time prior to the consummation of the sale. Even the deed was carried to and delivered to Mr. Bean by Root for Prickett. No question is made as to the exact location of lot 11 upon the ground. Nor is it claimed that Root made any misrepresentations or mistake in pointing out its location and boundaries upon the ground, even if it be said that he assumed to do so. We think the foregoing summary of the testimony touching the question of Root's alleged false representation, as to the lot being a corner lot, and the alleged reliance of Piolett and Bean thereon, inducing the purchase of the lot, is as favorable to the claims here made in behalf of Mrs. Bean and her husband as can be truthfully made from the record before us. The trial of this case occurred, and the testimony relied upon to show the alleged false representation and Bean's reliance thereon, was given in October, 1917, which, it will be noticed, was over seven years after the making of the alleged false representation. That the parties dealt at arm's length in their negotiations and in the consummation of the sale of the lot, is plain.

Counsel for Mrs. Bean and husband seem to rely upon our decisions in *Freeman v. Gloyd,* 43 Wash. 607, 86 Pac. 1051; *Bradford v. Adams,* 73 Wash. 17, 131 Pac. 449; *Lyle v. Cunningham,* 79 Wash. 420, 140 Pac. 330; holding, in substance, that a vendor owner of real property "if he undertakes to point out the boundaries at all, must point them out correctly, under penalty of responding in damages, or to an action of rescission."

We think that is not the controlling law of this case. This is not a question of erroneous pointing out of

the location or boundaries of the lot upon the ground. All parties agree that the lot lay upon the ground exactly where Root, Piolett, and Bean found it. There was not the slightest misrepresentation or mistake on the part of any one as to that fact. The alleged misrepresentation here relied upon by Bean as being made by Root, as agent of Prickett, was not as to the location of the lot upon the ground, but as to its being a corner lot, and there being a street along its east as well as its south boundary. That Root in his talk with Piolett assumed it was a corner lot, may be conceded; but that Piolett also assumed it to be a corner lot, wholly independent of what Root may have said on that subject, is, we think, little short of conclusively shown by the evidence. The information indicating this belief on the part of Piolett came from the maps produced, not by Root, but by Piolett himself, which were part of the office equipment of Bean and Piolett. There is no evidence that Root had acquired any knowledge on this subject other than from the unofficial maps commonly used, of which Bean and Piolett's maps were copies. Touching the question of the information relied upon by Piolett as agent of Bean, he says, as above noticed:

"In making this transaction I relied exclusively on what is shown here by this map. Of course, it is a very easy matter to locate property. I relied on the map, on the indications and also it was being sold to us as a corner lot. Mr. Root was selling it to me as a corner lot. He said it was a corner lot. He brought it to me that way, as a corner lot."

It seems quite plain to us, from Piolett's own testimony, that he was acting upon his own information, independent of what Root said as to the lot being a corner lot; and that whatever Root said to him upon that subject was based upon the same information

possessed by Piolett, and that Piolett must have assumed such to be the fact and was not relying upon Root possessing superior information upon that subject. However, the sale was not closed by Root with Piolett as the agent of Bean, but was closed by Root with Bean himself, who, upon his return, went out to the lot, inspected it upon the ground, seeing exactly where the lot and its boundaries were located upon the ground. Bean does, in his testimony, make some very general statements as to Root selling the lot to him as a corner lot. But he does not say anywhere in his testimony that Root in fact ever said to him, in so many words or in substance, that it was a corner lot, in the sense that Root was assuming to give Bean any information upon that subject.

Turning now to Root's testimony, which, as we have noticed, was taken by deposition, so that we are in as good a position as the trial court to interpret it and measure his credibility, we find him saying, that "it was a corner lot to my understanding;" and that "I gave them to understand it was a corner lot." When he is asked whether or not his authority to make the sale as agent was oral or in writing, and what commission or compensation he was to receive, or did receive, for making the sale, he says: "I don't know." When asked whether or not the maps and plats in the office of Piolett and Bean were referred to in the negotiations for the purpose of showing the location of the lot, he says: "I don't know." And when further asked whether or not it is true that Piolett and Bean, one or both, gave him to understand that they were relying upon their independent knowledge as real estate men, upon the maps in their own office, and the fact that they were familiar with the street conditions there, he answered: "I don't know." In view of

the fact that this testimony of Root was given seven years after the occurrence of which he testifies, and his evident lack of memory as to the facts of which he was asked, other than his representation to Piolett and Bean as to the lot being a corner lot, it seems to us that his testimony proves practically nothing as to Piolett and Bean's relying upon his statement of the lot being a corner lot. Indeed, it is hard to believe he ever made any such statement to either of them, any more than that they made such a statement to him.

. There is in this record evidence showing that Prickett knew that lot 11 was not a corner lot. But it is to be remembered that he never talked to Bean about the lot, its location, or its surroundings prior to the consummation of the sale. And in view of the unsatisfactory nature of Root's testimony, we are convinced that Prickett never instructed Root to tell any prospective purchaser that lot 11 was a corner lot. And in view of the whole testimony we are convinced that Root never did state as a fact to Piolett or Bean that lot 11 was a corner lot, with the intention of having either of them rely upon such statement, and that neither Piolett nor Bean relied upon any such statement made by Root. We think Bean is in no different position than he would be if there had been absolute silence during the negotiations, as to whether or not the lot was a corner lot, and each party were supposing the other to be fully and correctly informed on that subject.

Counsel for Bean rely upon the decisions in *Friday v. Parkhurst,* 13 Wash. 439, 43 Pac. 362; *Kuehl v. Scott,* 66 Wash. 318, 119 Pac. 742, and *Hoock v. Bowman,* 42 Neb. 80, 60 N. W. 389, 47 Am. St. 691; involving misrepresentations made by vendor owners

of lots as to the existence and nature of streets bounding them.  A critical reading of those cases will show, however, that not only was the proof clear that the representations were made, but they were the inducing cause of the purchase, and made under such circumstances as to entitle the purchaser to rely thereon.  We think those cases are not controlling here.

We conclude that the decree must be reversed upon the ground that it is not proven, with that degree of certainty required in cases of this nature, that Bean was induced to purchase the lot by any representation made by Prickett through his agent Root as to the lot being a corner lot.  This renders it unnecessary to notice other grounds of reversal urged by counsel for Mrs. Greenwood.

The decree is reversed, and the cause remanded to the superior court for further proceedings consistent with the views herein expressed.

MAIN, FULLERTON, and HOLCOMB, JJ., concur.